RECEIVED DM
JUL 19 2005
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

VERNON L. HUGHES

versus

CIVIL ACTION NUMBER 04-0500
JUDGE TOM STAGG

THE CITY OF SHREVEPORT

## MEMORANDUM RULING

Before the court is a motion for summary judgment filed by the defendant, the City of Shreveport ("the City"). See Record Document 16. For the reasons set forth below, the defendant's motion for summary judgment is **GRANTED**.

## I. BACKGROUND

Vernon L. Hughes ("Hughes") was employed by the City's Office of Water & Sewage as a maintenance mechanic at the Amiss water treatment plant until January of 2003. See Record Document 16, Deposition of Vernon L. Hughes ("Hughes Deposition") at 38. In May of 2002, the acting Team Leader, Hezekiah White, resigned from that position and was replaced by Keith Davis ("Davis"). See Record Document 16, Affidavit of Larry V. Landry ("Landry Affidavit") at 1-2. It seems that this change resulted in heightened tension at the plant because the

maintenance staff resented the fact that an employee from operations had been awarded the supervisor position rather than someone from within the maintenance department. See Record Document 16, Affidavit of Colleen Hull ("Hull Affidavit") at 2.

On May 23, 2002, Hughes was reprimanded by Davis for insubordination and failure to follow orders. See Record Document 16, Hughes Deposition Ex. 2. The reprimand was the result of incidents on May 20-22, during which Hughes refused to follow Davis's instructions and "wash the basins at drain level." See id. Later that day, the maintenance personnel filed a grievance with Superintendent Larry Landry regarding the recent changes in the department. See Record Document 16, Hughes Deposition, Ex. 27. The grievance complained that it was unfair that an employee from operations had been appointed as the new supervisor as opposed to someone from within the department. See id. The grievance made absolutely no mention of discrimination based upon race or any other protected classification. See id.

On June 13, 2002, Hughes received another reprimand from Davis for insubordination and failure to follow orders after Hughes shouted at Davis about a new work schedule and then informed Davis that he did not have to follow Davis's orders. See Record Document 16, Hughes Deposition, Ex. 4. This reprimand

2

contained a warning that continued insubordination would result in more severe discipline. See id. Later that day another grievance was filed with Superintendent Landry, again complaining about Davis receiving the supervisor position. See Record Document 16, Hughes Deposition, Ex. 29. However, once again the grievance contained no mention of racial discrimination.

On June 24, 2002, Hughes received yet another reprimand from Davis for insubordination and failure to follow orders. This time the reprimand was based upon Hughes's refusal to turn in his preventative maintenance sheets, his shouting about the issue, and speaking to Davis in an inappropriate tone of voice while shaking his finger in Davis's face. See Record Document 16, Hughes Deposition, Ex. 3. Later the same day, Hughes filed a grievance with Colleen Hull in the City's personnel department, in which he complained of harassment. See Record Document 16, Hughes Deposition, Ex. 30. Hughes complained about the reprimands he had thus far received and stated that he believed they were a form of harassment by Davis and the Assistant Superintendent, Phillip Leon, as a result of a personal problem they had with him because of "their relationship in the past." Id. Hughes made no mention of racial discrimination in his grievance. Hughes also appealed the reprimands to Davis in a letter accusing him of harassment and retaliation. See id. at Ex. 31. While Hughes still made no mention of any race-

based harassment or discrimination, he did conclude his letter by reminding Davis of his "rights as protected by the Civil Rights Act of 1964 (Title VII)." Id.

As a result of Hughes's complaint, the City's personnel department launched an investigation into the accusations, during which all of the employees in the maintenance department, including the supervisors, were interviewed. See Record Document 16, Ex. C, Hull Affidavit. During the course of these interviews, the majority of the employees denied that they had witnessed or endured any harassment. See id. However, the investigation did show that many employees within the maintenance department felt they were being treated differently than the operations department employees. See id. Despite this discovery, the investigation concluded that there had been no misconduct as defined in the City's harassment policy. See id.

On July 24, 2002, an incident report was written by the security guard assigned to the entrance of the Amiss water plant, citing Hughes for speeding past the entrance without stopping. See Record Document 16, Hughes Deposition, Ex. 7.[1] That same day, Hughes allegedly used his City-owned vehicle to pick up lunch,

---

[1] After September 11, 2002, Vinson Guard Service began providing service to the Amiss water plant because of the potential threat of a terrorist attack on water treatment facilities. Subsequently, Dari Fortenberry, the Chief Operations Supervisor, issued a memo to all personnel at the plant regarding the

in direct violation of a directive from Davis. Only two days later, on July 26, 2002, the guards reported that Hughes had again sped past the entrance without stopping. See Record Document 16, Hughes Deposition, Ex. 10. As a result of this most recent incident, a pre-disciplinary conference was scheduled for July 31, 2002. The pre-disciplinary conference resulted in the determination, by Director Mike Strong ("Strong"), that Hughes had violated three sections of the personnel rules and regulations including the provisions prohibiting the violation of safety rules in the workplace, insubordination and failure to follow orders, and dishonesty in the form of taking, stealing, or misusing City property. See id. As a result of this determination, Hughes was suspended for five days. See id.

Almost two months after Hughes's suspension, on September 24, 2002, he filed a complaint of racial discrimination with Strong. See Record Document 16, Hughes Deposition, Ex. 37. His specific claim was that black employees who did "the least thing" would get written up or be called to a pre-disciplinary conference. Id. Based upon this complaint, another investigation was launched and once again

---

need to stop at the main entrance gate upon entering and leaving the facility in order to allow the guards to identify the driver so that they might maintain their logs of all personnel entering and exiting. See Record Document 16, Ex. 7 at 12.

5

the conclusion was that despite some evidence of favoritism towards the operations employees, there had been no harassment or misconduct at the Amiss plant. See id. In October of 2002, Hughes met with the City's Chief Administrative Officer, Ken Antee ("Antee"), to again discuss his suspension. See Record Document 16, Hughes Deposition, Ex. 38. However, Antee found that a three to five day sentence was appropriate and upheld Hughes's suspension. See id.

On January 9, 2003, Hughes had an altercation with Randy Gallien ("Gallien"), the painting supervisor. According to Hughes, he and Gallien had experienced problems before. See Record Document 16, Hughes Deposition at 32. Hughes alleges that Gallien started calling him names and that he responded by telling Gallien that he was the devil and was going to hell. See id. at 33-34. Hughes claims that Gallien asked him to come to the "low service" area by the railroad track so that he could "beat his ass." See id. at 34. Hughes claims that he did not go, instead remaining seated in his chair, but that after a few moments he pulled a six inch knife from his pocket "to clean his fingernails." Id. at 32. However, witnesses from the incident testified to the contrary. Id. at 53-54.

As a result of this most recent incident, another pre-disciplinary conference was scheduled for January 16, 2003. Before the conference, Strong interviewed witnesses to the altercation. Gallien claimed that Hughes pulled a knife on him and

asked him to come to the low service area. See Record Document 16, Hughes Deposition, Ex. 8. Two witnesses, Darnell Williams and Joe Harris, also claimed that Hughes threatened Gallien with the knife. See Record Document 16, Hughes Deposition, Exs. 11 and 12. Another witness, Sherry Swilley, stated that while she did not actually hear Hughes make any threats to Gallien, she did hear Gallien tell Hughes that if he was going to pull a knife he better be willing to use it and then heard Hughes ask Gallien to come down to the low service area. See Record Document 16, Hughes Deposition, Ex. 13. After the conference, Strong concluded that Hughes had violated four sections of the personnel rules and regulations and therefore made the decision to terminate Hughes's employment. See Record Document 16, Strong Affidavit at 2. Hughes appealed his termination to the Personnel Board who heard from Hughes as well as other witnesses and then unanimously voted to affirm his termination. See Record Document 16, Hughes Deposition, Ex. 39 at 57. Hughes subsequently filed the instant suit, pro se, alleging racial discrimination and retaliation. See Record Document 1.

## II. ANALYSIS

A.  **Summary Judgment Standard.**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Stahl v. Novartis Pharm. Corp., 283 F.3d 254, 263 (5th Cir. 2002). If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275, 282 (5th Cir. 2001). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Alton v. Tex. A&M Univ., 168 F.3d 196, 199 (5th Cir. 1999).

**B.    Race Discrimination.**

Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin. See 42 U.S.C. § 2000e-2(a). A clear evidentiary framework for analyzing Title VII claims was set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct.

1817 (1973). Under the McDonnell Douglas framework, a Title VII plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. A prima facie case of race discrimination in a discriminatory discharge case such as this one is established by showing that (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff was discharged; and (4) the defendant replaced the plaintiff with someone from outside the protected class. See Frank v. Xerox, 347 F.3d 130, 137 (5th Cir. 2003); Bauer v. Albermarle Corp., 169 F.3d 962, 966 (5th Cir. 1999).

If the plaintiff succeeds in establishing a prima facie case, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory, reason for the challenged employment action. If the defendant "comes forward with a reason which, if believed, would support a finding that the challenged action was nondiscriminatory, the inference raised by the plaintiff's prima facie case drops from the case." LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 448 (5th Cir. 1996). In this event, the burden shifts back to the plaintiff who must demonstrate that the defendant's articulated nondiscriminatory rationale is pretext, thereby proving that the defendant intentionally discriminated against the plaintiff. The plaintiff can prove that the reason was pretext in two ways: "either [1] directly by persuading the court that a discriminatory reason more than likely motivated the

employer, or [2] indirectly by showing that the employer's proffered explanation is unworthy of credence." Thornbrough v. Columbus and Greenville R.R. Co., 760 F.2d 633, 639 (5th Cir. 1985). At the summary judgment stage, the question is not whether the plaintiff has proven pretext, but rather whether the plaintiff has raised a genuine issue of fact with respect to pretext. See Hall v. Gillman Inc., 81 F.3d 35, 37 (5th Cir. 1996).

Hughes is unable to overcome defendant's motion for summary judgment as he is unable to set forth a prima facie case of discrimination; he has not shown that he was replaced by someone outside the protected class as required by Frank v. Xerox, 347 F.3d 130, 137 (5th Cir. 2003). In fact, Hughes has provided no evidence that he was replaced at all. In response to the City's motion for summary judgment, Hughes merely re-filed his complaint, this time entitled "Answer." See Record Document 18. He filed no affidavit or supporting evidence of any kind. As such, there is nothing in the record to indicate that he was replaced after his termination, much less that he was replaced by someone from outside his protected class.

Even if Hughes was able to make a prima facie case, he would still be unable to survive summary judgment because the City has numerous legitimate, nondiscriminatory reasons for his termination, all of which Hughes is unable to

rebut by demonstrating pretext. After the pre-disciplinary conference held on January 16, 2003, Strong determined that Hughes had violated at least four sections of the personnel rules and regulations including the prohibition against fighting, profanity, and abusive or threatening language. Therefore, Strong made the decision to terminate Hughes. However, Hughes has put forth absolutely no evidence to demonstrate that Strong's reasons were false or were pretext for discrimination.

In his deposition Hughes claimed that he was merely cleaning his fingernails with the knife and did not threaten Gallien. See Record Document 16, Hughes Deposition at 32-35. However, numerous witnesses made statements that contradict this claim and indicate that Hughes did in fact threaten Gallien on at least some level. See Record Document 16, Hughes Deposition, Exs. 8, 11, 12, 23. Even assuming that Hughes's claim is correct, and he was cleaning his fingernails, it is not sufficient for Hughes to show that Strong's belief that Hughes violated personnel rules and regulations was mistaken. In order to survive summary judgment Hughes must demonstrate that Strong acted with discriminatory intent. See Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (1995). This he has not done.

Hughes has set forth absolutely no evidence that the legitimate, non-discriminatory reasons for his termination articulated by the City were merely

pretext for discrimination. Consequently, defendant's motion for summary judgment is **GRANTED** with regard to this issue.[2]

C.   **Harassment.**

Hughes alleges that the City also discriminated against him in violation of 42 U.S.C. § 2000e-2 by subjecting him to a hostile work environment. Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer. . . to discriminate against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a Title VII violation by proving that racial discrimination has created a hostile or abusive work environment. See Ramsey v. Henderson, 286 F.3d 264 (5th Cir. 2002); Celestine v. Petroleos De Venezuella SA, 266 F.3d 343, 353 (5th Cir. 2001).

It is well settled that in order to establish a hostile work environment claim in violation of Title VII, a plaintiff must establish five elements: (1) the employee

---

[2] While this ruling focuses on Hughes's termination as the instance of alleged discrimination, the court is well aware that Hughes contends that his reprimands and suspension were also instances of discrimination. However, even considered together, it is clear to the court that Hughes's claims are unable to survive summary judgment. The City has set forth legitimate, non-discriminatory reasons for Hughes's termination, which he is unable to rebut.

12

belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer know or should have known of the harassment in question and failed to take prompt remedial action. Celestine, 266 F.3d at 353. However, in cases where the alleged harassment has been committed by a supervisor with "immediate (or successively higher) authority over the harassment victim," the plaintiff need not establish the fifth element. Id.

In order for harassment on the basis of race to be considered to "affect a term, condition, or privilege of employment," the harassment must be "'sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment.'" Ramsey v. Henderson, 286 F.3d 264, 268 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370 (1993)). The court must consider all of the circumstances surrounding the alleged harassment to determine if it rises to this level. See id. at 268. These pertinent circumstances include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id.

Hughes claims that he was subjected to a hostile work environment while working at the Amiss water treatment facility. More specifically he complains that:

1) In July of 2002, Superintendent Larry Landry said "Why do you people always say this is soul food. Y'all call certain food soul food." Record Document 16, Hughes Deposition at 91. Hughes categorizes this comment as one of Landry's "racial jokes". Id. at 92.

2) Landry commented that "if you people want to move up, get an education and go to school." Id. at 94-95. Hughes stated that he felt this comment was directed at the black employees because only black employees were around when the comment was made. See id. at 95-96.

3) Landry issued a memo in July of 2001, which read: "If you want to be the one to make decisions, I suggest the following: Work very hard. Educate yourself. Demonstrate exemplary work habits and behavior. Be a team player. Seek and receive promotions. Then you can be the one who makes the decisions." Id. at 99; Record Document 16, Hughes Deposition, Ex. 16. This memo was addressed to all employees of the plant; however, Hughes claims that the memo singled out the black employees. See id.

4) Landry put up a poster from the business book, "Who Moved My Cheese". See Record Document 16, Hughes Deposition at 102. Hughes claims that

14

he was offended by the poster because it was just being pointed out to the black employees. See id. at 104.

There is nothing in the record to indicate that any of the alleged comments or actions were in any way based upon race. Hughes's belief that they were racial and offensive is not sufficient. However, even if these comments were based upon race, they would not rise to the level necessary to support a claim of hostile work environment because Hughes cannot show that the alleged hostile environment affected a term or condition of his employment, in other words, he cannot show that the harassment was severe or pervasive. Courts have repeatedly deemed much more offensive conduct and comments to be inadequate. See Pickens v. Shell Tech. Ventures Inc., 118 Fed. Appx. 842 (5th Cir. 2004) (holding that company Christmas party featuring a "traditional Dutch skit" in which children appeared in black face and during which other employees in the audience made racially derogatory comments to African-American employees was not severe or pervasive); Vaughn v. Pool Offshore Co., 683 F.2d 922 (5th Cir. 1982) (holding that terms such as "nigger" "coon" and "black boy" were used in circumstances without animus and therefore did not constitute harassment). The conduct complained of by Hughes simply does not rise to the level necessary to create a hostile work

environment. Therefore, the City's motion for summary judgment is **GRANTED** with regard to Hughes's claims of hostile work environment.

**D. Retaliation.**

Hughes also claims that the City retaliated against him in violation of Title VII. Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter. . . ." 42 U.S.C. § 2000e-3(a). To succeed on this claim, Hughes must show that (1) he engaged in activity protected by Title VII, (2) the City took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse employment action. See Raggs v. Miss. Power & Light Co., 278 F.3d 463, 471 (5th Cir. 2002). "The ultimate determination is whether, 'but for' the protected conduct, the employer would not have engaged in the adverse employment action." Douglas v. DynMcDermott Petroleum Operations Co., 144 F.3d 364, 372 (5th Cir. 1998) (citations omitted).

Like discrimination claims, retaliation claims can be subject to the McDonnell Douglas burden shifting analysis if circumstantial evidence is used, as is the case here. However, because the plaintiff has failed to establish a prima facie case of retaliation, the burden never shifts to the City.

Under controlling circuit jurisprudence, only an "ultimate employment decision" such as "hiring, granting leave, discharging, promoting, and compensating" can constitute an adverse employment action. Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir. 1997) (quoting Dollis v. Rubin, 77 F.3d 777, 781-82 (5th Cir. 1995)). Hughes was discharged by the City, thus easily meeting this element.

An employee has engaged in activity protected by Title VII if he has either (1) "opposed any practice made an unlawful employment practice" by Title VII, or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). See also Haynes v. Pennzoil Co., 207 F.3d 296, 299 (5th Cir. 2000). In other words, a plaintiff must show that he made a charge or opposed discrimination based upon a protected category.

The majority of Hughes's conduct cannot be fairly characterized as a protest of or opposition to practices made unlawful by Title VII. Hughes filed general grievances and complaints on May 23, 2002, June 13, 2002, and June 24, 2002, however, the complaints did not address any problems with discrimination. It was not until September 24, 2002, that Hughes first made a complaint of discrimination, thus engaging in a protected activity.

Hughes, however, has failed to demonstrate a causal link between his complaint of discrimination and his termination. There is no evidence linking Hughes's termination to the complaint of discrimination on September 24, 2002. In fact, Hughes himself even admitted that he had no facts to support his claim that he was terminated in retaliation for the complaints and grievances he filed. See Record Document 16, Hughes Deposition at 116-117. Furthermore, Hughes would not be able to survive the burden-shifting framework applicable had he successfully stated a prima facie claim for retaliation. Clearly, legitimate, non-discriminatory reasons existed for his termination, as evidenced by the findings that Hughes had violated numerous company rules, including the prohibition against fighting and abusive or threatening language.

There simply is no evidence of retaliation currently before the court. Therefore defendant's motion for summary judgment is **GRANTED** with regard to Hughes's claim of retaliation.

### III. CONCLUSION

For the reasons set forth above, the City of Shreveport's motion for summary judgment is **GRANTED** and all of Hughes's claims against it are **DISMISSED WITH PREJUDICE.**

A judgment consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DATED AND SIGNED** at Shreveport, Louisiana, this 19th day of July, 2005.

JUDGE TOM STAGG